**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| Duane L. Galloway, Successor Trustee of the Helen L. Verock Living Trust U/A Dated 11/11/92, | CASE NO. 3:25-cv-1753 |
| Plaintiff, | JUDGE JACK ZOUHARY |
| v. | |
| Equiniti Trust Company, LLC | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Defendant. | |

## INTRODUCTION

Plaintiff is like thousands of other shareholders who each year realize that they have lost a stock certificate. Sometimes this realization occurs when they decide to sell the underlying security, and sometimes when the company is sold and they seek access to the proceeds. No matter, pursuant to the Uniform Commercial Code, each of the United States statutorily requires that issuers address situations involving lost certificates as long as the owner takes certain steps, including providing the issuer with a “sufficient indemnity bond”. The overwhelming majority of public companies assign this task to stock transfer agents which handle the administrative aspects of a public company with shareholders, e.g., keeping track of who owns how many shares, paying dividends, issuing proxy materials and annual reports, and tabulating shareholder votes. Plaintiff brings this action because Defendant charged an excessive bond in connection with lost certificates.

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this dispute because this Court can exercise personal jurisdiction over Equiniti Trust Company, LLC ("Equiniti") pursuant to Fed.R.Civ.P. 4(k)(1)(A) and Ohio Rev. Code § 2307.382; because the parties are residents of different states; and because the amount in controversy for all class members exceeds $75,000.

2. This Court is the proper venue for this dispute as the facts relevant to the dispute occurred in this district and gave rise to the claims for relief set forth herein.

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. 1332(d)(1) as the Plaintiff is a resident of a state different from the home state of the Defendant and the matter in controversy exceeds the sum or value of $5,000,000.

Stock Transfer Agents

4. Stock transfer agents are regulated entities appointed by public companies to perform issuer-mandated securities recordkeeping and administrative functions. Acting on behalf of the issuer, a transfer agent maintains the company's official shareholder ledger, records and processes transfers of ownership, issues and cancels stock certificates or book-entry interests, administers Direct Registration System (DRS) accounts, and implements corporate actions such as dividends, stock splits, mergers, and reorganizations.

5. Transfer agents also handle shareholder-initiated transactions arising from these issuer appointments, including account maintenance, certificate replacement, and ownership research, performing those services pursuant to standardized procedures and fee schedules established by the agent and applied to shareholders of the issuer.

The Principal Agent Distortion – Issuer Appoints But Shareholders Pay

6. Although transfer agents are appointed and retained by issuers, many of the services they perform are provided directly to individual shareholders, who are charged fees pursuant to agent-published schedules.

7. The issuer typically identifies the transfer agent in its public disclosures but does not pay or negotiate the fees assessed to shareholders for transactions such as certificate replacement, transfer processing, or account research. As a result, the entity that selects and retains the transfer agent is generally not the entity that bears the cost of many shareholder-facing services, while the shareholders who incur those costs have no role in the agent's selection and no practical ability to choose an alternative provider.

8. Public companies headquartered in Ohio illustrate the structural separation between issuer selection of transfer agents and shareholder payment of transfer-agent fees. Forty-two Ohio-based SEC reporting companies such as The Kroger Co. (Cincinnati, Ohio), The Progressive Corporation (Mayfield Village, Ohio), and Cincinnati Financial Corporation (Fairfield, Ohio) publicly identify Equiniti or an affiliate as their stock transfer agent in their proxy statements, typically naming Equiniti Trust Company, LLC (d/b/a EQ Shareowner Services).

9. Transfer agents are appointed by the issuer, not chosen by shareholders.

10. Initial contracts between issuers and stock transfer agents are typically for a period of 3-5 years and thereafter renew automatically for a period of 1-3 years.

11. The relationship between an issuer and a stock transfer agent typically lasts for many years and many renewals because of high switching costs, the operational risk of migrating

shareholder records, regulatory oversight obligations, the potential for transaction errors, simple inertia and the fact that issuers typically pay little attention to fees paid by shareholders.

12. Shareholders who must replace a lost certificate, process a transfer, research an account, or obtain an indemnity bond are required to pay fees directly to the issuer-appointed transfer agent pursuant to the agent's standard shareholder fee schedule, which assesses charges to shareholders rather than the issuing company.

Equiniti's Ohio Business

13. As noted, forty-two different Ohio-based SEC reporting companies publicly identify Equiniti or an affiliate as their stock transfer agent. Equiniti solicited the business of each of these companies, and thereafter entered into contracts with each of these Ohio-based companies to provide services to both the companies and their shareholders. The companies (together the "Ohio Public Companies") are:

1. Abercrombie & Fitch Co.
2. Arhaus, Inc.
3. AtriCure, Inc.
4. Avient Corp.
5. Bath & Body Works, Inc.
6. Chemed Corp
7. Cincinnati Financial Corporation
8. Cintas Corp.
9. Civista Bancshares, Inc.
10. Cornerstone Strategic Investment Fund, Inc.
11. Cornerstone Total Return Fund Inc.
12. Diamond Hill Investment Group, Inc.
13. Diebold Nixdorf, Incorporated
14. Fifth Third Bankcorp.
15. FirstEnergy Corp
16. Franchise Group, Inc.
17. General Electric Co
18. Invacare Corp
19. Kroger Co
20. MasterBrand, Inc.

21. Medpace Holdings, Inc.
22. Northern Lights Fund Trust
23. Northern Lights Fund Trust IV
24. Olympic Steel Inc
25. Parker-Hannifin Corp
26. Paycor HCM, Inc.
27. Peoples Bankcorp Inc.
28. Procter & Gamble Co
29. Progressive Corp/OH/
30. Rex American Resources Corp
31. Root, Inc.
32. RPM International Inc.
33. Scotts Miracle-Gro Co
34. Sherwin Williams Co
35. Sterling Check Corp.
36. The Timkin Company
37. TravelCenters of America Inc.
38. Ultimus Funds Solutions LLC /TA
39. Unifund Financial Technologies, Inc.
40. United Bancorp Inc/OH
41. Victoria's Secret & Co.
42. Wendy's Co.

14. In the course of performing its work for each of the Ohio Public Companies and for Bob Evans Farms, Inc. ("Bob Evans") before it was sold, Equiniti has for many years been engaged in continuous and systematic contacts with each of these companies, providing the following services listed on its website:

a. "EQ provides comprehensive transfer agent services, share registry management, dividend disbursement, tax operations, and more."

b. "Transfer Agency & Registrar Services … EQ goes beyond traditional transfer agent services to keep companies informed about changes in regulatory and reporting."

c. "Equiniti: A Global Leader in End-to-End Shareholder and Corporate Communications … Transfer Agent Services, Employee Plan Solutions, Proxy Services …"

d. "We offer a wide range of IR [Investor Relations]-related analysis, research and advisory services … help you understand the market's perception of your stock and provide unconflicted investor relations advice and strategies."

e. "With our comprehensive equity compensation solutions, we help you invest in your employees' success. From stock options to employee stock purchase plans."

f. "Corporate Trust Services … simplify complex transactions with EQ's proven and comprehensive trust solutions."

15. Equiniti also states that it provides the following services to shareholders of companies for which it contracts as the transfer agent:

a. "Access to the tools and resources you need as an individual or employee shareholder, as well as for stock purchasing and proxy voting."

b. "Shareholder Central — Securely manage your stock accounts and perform transactions."

c. "Proxy Voting … View proxy materials, request paper copies and vote your online proxy."

d. "EQ provides scalable end-to-end business services to over 33 million shareholders …"

e. "EQ's online portal lets shareholders manage their accounts, view statements, update details, and stay informed."

f. "… EQ is proud to help look after the shares you own in one or more of the greatest companies in the world."

16. In addition to providing services to public companies, Equiniti offers private company services including cap-table management, equity-plan administration, and related ownership services for companies that are not publicly traded. Although publicly-available records of Equiniti providing such services to private Ohio-based companies are generally not public, at least one company (Double Bottomline) has disclosed this. Given the very small number of companies that provide such services and the far greater number of private companies, Plaintiff alleges on information and belief that Equiniti has and continues to provide a substantial amount of services to private, Ohio-based companies.

17. Equiniti was a public company until it was taken private in 2021. In 2023, the American Stock Transfer & Trust Company LLC (AST) and Equiniti merged.

18. Until Bob Evans was purchased by Post Holdings, Inc., AST had served as the stock transfer agent for at least a decade, entering into contracts and renewals of contracts with Bob Evans. Based upon the publicly disclosed financial statements of Equiniti before it went private and the financial statements of its competitor, Computershare, Plaintiff alleges that Equiniti earns at least $7 million each year from Ohio-based businesses and their shareholders.

19. Equinity has purposefully availed itself of the privileges of doing business within the state of Ohio and has directed a substantial portion of its business activities to the state and to individuals within it.

## PARTIES

20. Plaintiff Duane L. Galloway, Successor Trustee of the Helen L. Verock Living Trust U/A Dated 11/11/92, was the owner of an interest in a former publicly-traded company represented by multiple certificates that were lost.

21. Defendant Equiniti Trust Company, LLC is a New York limited liability trust company which provides, among other things, services as a stock transfer agent.

22. Like hundreds if not thousands of companies, the issuer of Plaintiff's stock contracted with Equiniti (together, "Equiniti" or "Agent") to provide certain statutorily required and other services to the issuer of Plaintiff's shares and its shareholders. Equiniti states on its website that it provides services to over 12,000 clients worldwide, including providing stock transfer services to 35% of the S&P 500, which accounts for 500 of the largest U.S. companies and approximately 80% of the total U.S. market capitalization. Fully 17 of the Ohio Public Companies are listed on the S&P 500.

## FACTUAL ALLEGATIONS

23. Equiniti is the second largest stock transfer agent in the United States, with some 20% of total market share as of 2022. The balance of the market is controlled by Computershare, and the rest is scattered among a handful of other smaller firms.

24. Recent years have seen a remarkable consolidation of the transfer agent field, such that they have achieved market dominance and have the ability to command a premium for services traditionally tied to those of a stock transfer agent.

25. Among other things, stock transfer agents keep track of who owns the shares of a company, replace lost certificates as required by statute from time to time, issue payment of dividends or distributions, disburse sale proceeds to owners upon presentment of certificates when companies are sold, attend to distribution of annual reports and proxy statements, and tabulate votes of the equity owners.

26. Helen L. Verock or an intermediate Successor Trustee of the Trust lost the certificates representing the Trust's ownership of Bob Evans. Upon information and belief, a subsidiary or an affiliate of AST, an entity which later merged into what became Equiniti. ASTacted and Equiniti continues to act as an agent for and on behalf of an insurer or bond company that issues a bond, and that further Equiniti is paid a commission in connection with the issuance of the bond. Because Equiniti and AST merged in 2023, references to Equiniti hereafter including AST before the merger.

27. Neither Plaintiff nor any of the other members of the Class he proposes to represent were informed by Equiniti of any other options other than to purchase a bond through Equiniti.

28. Neither Plaintiff nor any of the other members of the Class he proposes to represent were advised that all issuers have an affirmative, statutory duty to replace lost certificates.

29. Neither Plaintiff nor any of the other members of the Class he proposes to represent were advised that the bond required by Equiniti could only be in an amount deemed sufficient.

30. Neither Plaintiff nor any of the other members of the Class he proposes to represent were advised of the amount by which the bond which Equiniti and/or its subsidiary or affiliate receives as a commission is inflated as to the amount of the premium.

31. Historically, the SEC advised investors that the premium for a lost certificate surety bond should be in the area of 1-2%.

32. In other countries, transfer agents (including Equiniti or an affiliate) sell surety bonds for lost certificates for a fee equal to less than 1% of the face value of the security.

33. In Plaintiff's case, Equiniti stated that he was required to pay a fee equal to approximately 5% of the liquidation value of the securities. In contrast, and although still significantly excessive, Computershare imposes a flat fee of 3%. The shares which Plaintiff owned were "registered" securities. They were not bearer securities. In other words, the securities were registered with the issuer, through its transfer agent, and to be transferred, a bona fide purchaser had to present to the transfer agent a certificate with a notarized endorsement by the seller. While the fraudulent transfer of a certificate is theoretically possible, upon information and belief, it is extremely rare.

34. The SEC maintains a list of missing certificates as part of its Lost and Stolen Securities Program (LSSP). Of course, the securities on this list represent only a portion of all

missing securities. Plaintiff, for example, was not aware of the list and neither he nor any predecessor trustees ever registered the lost securities with the LSSP. In 2012, the SEC published a memo regarding lost certificates indicating that *reported* lost certificates on the LSSP at the end of 2011 were worth approximately $801 Million.[1] As of that same time period, the stock market had a total value of approximately $15.645 Trillion[2] implying that lost certificates represented about .05% of the total market. Applying that same percentage to today's $52 trillion total market value, and given Equiniti's 20% market share, Equiniti would receive approximately $26 million to replace lost certificates. Of course, not all of those fees will be received in single year, but more certificates will be lost and even a short statute of limitations supports the conclusion that the recoverable fees paid by the class are in the millions of dollars.

35. One website claims that it charges a bond issuance premium in an amount approximately 1/3 what Equiniti charges.[3] Equiniti charges a fee equal to 5% of the value of the shares as of July 1, 2024. Assuming that this represents a 70% excess fee, and the SEC has long maintained that bonds cost in the range of 1-2%[4] (so this makes sense), that too would indicate damages to the class in the millions of dollars.

## CLASS ACTION ALLEGATIONS

36. Plaintiff brings this action under Fed.R.Civ.P. 23(a); (b)(1)(A); (b)(2); and, (b)(3), on behalf of himself and the other members of the Plaintiff Class defined as: All persons and

---

[1] https://www.sec.gov/investor/alerts/lss.pdf
[2] https://siblisresearch.com/data/us-stock-market-value/
[3] https://surety1.com/bond_info/lost-stock-certificate-surety-bond/. And there are other competitors: https://www.suretybondsdirect.com/quote/request?bond=lost-security-bond&state=OH&dtl=2120
[4] https://www.investor.gov/introduction-investing/investing-basics/glossary/lost-or-stolen-stock-certificates#:~:text=The%20bond%20usually%20costs%20between,an%20innocent%20purchaser%20acquires%20it.

entities who have and/or will have paid before this matter is concluded Equiniti's flat rate fee and commissions to address lost certificates.

37. Based on information and belief, the members of the Class exceed tens of thousands in number, making joinder of all Class members impracticable.

38. The claims set forth in this Complaint are common to each member of the Plaintiff Class. The Plaintiff and each Class member are subject to the payment of the same flat rate fees and commissions to Equiniti.

39. There are questions of law and/or fact common to the Class which predominate over any questions effecting individual members of the Class. These include: (a) whether Equiniti charged a flat rate fee to Plaintiff and the members of the Class; (b) whether Equiniti's fee was reasonable as required by the laws of all 50 states; (c) whether Equiniti's fees and commissions grossly exceeded its actual costs; (d) whether Equiniti received an impermissible commission or kickback in connection with the purchase of a bond or bonds in exchange for accepting the nominal risk to the issuer that someone might present an attempt to negotiate a lost certificate after a replacement certificate was issued; (e) whether Equiniti and/or a bond company conducted any underwriting in connection with the issuance or a bond or bonds; (f) whether Equiniti received a commission and substantial compensation in excess of what any issuer could charge in connection with the statutory requirement that the party petitioning for a replacement certificate merely post "a sufficient indemnity bond"; (g) whether the issuer could make a profit in connection with the statutorily required issuance of a replacement certificate and, if not, whether its agent could do so; and, (h) why Equiniti generally charges a five percent fee for a bond to secure a replacement certificate when the largest transfer agent generally charges three percent.

40. Attached as Exhibit A and hereby incorporated into this Complaint as though rewritten here is a compendium of the laws of the 50 states as they apply to the obligation of an issuer to issue a replacement certificate. As demonstrated therein, the laws of the 50 states are overwhelmingly identical in limiting the issuer to require a "sufficient indemnity bond" or similar language to protect it against the exceedingly rare occasion in which the original certificate, thought or claimed to be lost, is later presented and negotiated.

41. The Plaintiff is an adequate representative of the Class members because: i) he is a member of the Class; ii) the claims he asserts in the Complaint are typical of the claims of the Class members; iii) Plaintiff's claims are not subject to any unique defenses, and, iv) Plaintiff's interests do not conflict with those of any other Class member.

42. The named Plaintiff will fairly and adequately protect the interests of the Class. None of the Plaintiff's interests conflict with any interest of the Class.

43. The claims set forth herein are proper for certification as a class action under the provisions of Rule 23 of the Federal Rules of Civil Procedure.

44. After addressing the questions common to the Class, only the determination of individual damages will remain, and that calculation is one of simple mathematics using records of the Defendant.

45. This class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because there are tens of thousands of members in the proposed Class and repeated individual discovery and litigation of the common issues shared by all Class members would needlessly waste judicial resources. The names and addresses of Class members will be readily identifiable from records of Defendant and through discovery of this action.

46. The Class members' interests in individually controlling the prosecution of separate actions do not outweigh the benefits of class-based litigation on those issues.

47. It is desirable to concentrate the litigation of these claims in one forum. Any difficulty in managing this case as a class action is outweighed by the immense benefits the class action has in efficiently disposing of common issues of law and fact among the large number of litigants.

48. The prosecution of this civil action by all Class members individually in separate actions would create a risk of inconsistent or varying adjudications of claims by the individual Class members that would establish incompatible standards of conduct for Defendant, could be dispositive of interests of other Class members not parties to the adjudications, or substantially impair or impede Class members ability to protect their interests.

49. Upon information and belief, there are no other similar cases pending against the named Defendant which address the issues as are raised in this case.

50. Furthermore, Plaintiff has retained competent counsel experienced in class action litigation to further insure such representation and protection of the Class. To prosecute this case, the prospective Class Representative has chosen the law firm of Murray and Murray Co., L.P.A. of Sandusky, Ohio. Plaintiff and his counsel intend to vigorously prosecute this action.

51. Managing this case as a Class Action should not present any particular difficulty.

## COUNT I

### Breach of Statutory Duty

52. Plaintiff reincorporates all previous paragraphs as if full re-written here.

53. Equiniti contractually accepts the statutory obligation of its issuer/customers to replace lost certificates and is therefore only allowed to impose requirements of a sufficient

indemnity bond and other "reasonable" requirements. Equiniti's issuer/customers may not take advantage of their shareholders and satisfy their statutory obligations by requiring shareholders with lost certificates to purchase a surety bond as to which the issuer/customers would receive a commission.

54. A person acting as a transfer agent for an issuer has the same obligation to the holder or owner of a security with regard to the particular functions performed as the issuer has in regard to those functions.

55. The receipt of a commission by the transfer agent is as impermissible as it would have been to the customer/issuer.. The servant has no more authority than that possessed by the agent. By collecting a commission on the sale of a surety bond, Equiniti increased the cost of the surety bond.

56. Upon information and belief, there is virtually no exposure for the issuer/customers especially where, as here, it chooses to require a surety from an insurance company. This is because the certificates owned by the Class are registered with the issuer and may only be transferred pursuant to a notarized signature together with the certificate. As a result, a risk of loss by the surety is also extremely low. Nonetheless, Equiniti charges an excessive premium equal to 5% of the market value of the lost certificate.

57. The Uniform Commercial Code requires that the requirement that an issuer replace a lost certificate when the owner satisfies certain requirements, including providing a sufficient indemnity bond, must be liberally administered so that the aggrieved party is put in as good a position as if the issuer (or here its agent) had fully performed. That requires that Equiniti return to Plaintiff and the members of the Class the excessive premium or other fees in an amount to be determined by a jury.

## COUNT II

### Breach of Contract

58. Plaintiff reincorporates all previous paragraphs as if full re-written here.

59. Equiniti entered into an agency contract with its issuer/customers to, among other things, fulfill its issuer/customers' statutory obligation to provide lost certificates to their certificate holders. Thus, satisfaction of the contract and the replacement of the lost certificate is necessary to satisfy a statutory obligation that the issuer has to the shareholder.

60. Plaintiff has not attached a copy of the contract specific to this issuer because it is not publicly available, although Plaintiff notes that Equiniti has attached a copy of its applicable contract which it has filed under seal and which Plaintiff incorporates by reference.

61. Plaintiff is an intended third-party beneficiary of the Agency Agreement and Plaintiff's reliance on Equiniti to replace Plaintiff's lost certificate on terms that are reasonable is both probable and reasonable. By requiring the Agent to provide lost certificate services, it made owners of lost certificates obvious, necessary and easily defined third-party beneficiaries. In fact, no one other than a shareholder or former shareholder has a claim for Equiniti's act of charging an excessive fee, the issuer having no standing or claim to do so.

62. Should the Stock Agency Agreement between Plaintiff's issuer and the Agent disclaim the existence of third-party beneficiaries, rules of interpretation require that the more specific provision by which the customer/issuer contracted with the Agent to address lost certificates prevails over a more general disclaimer. One cannot disclaim a contractual right required to be provided by a corporation by law by saying in the very agreement by which it purports to satisfy that obligation that there is nonetheless no obligation due the owner of a lost certificate.

## COUNT III

### Unjust Enrichment

63. Plaintiff reincorporates all previous paragraphs as if full re-written here.

64. Plaintiff and the members of the proposed Class have paid excessive premiums and fees to Defendant.

65. Defendant has been enriched by the excessive premiums and fees it has collected from Plaintiff and the members of the proposed Class. Defendant is fully aware of the benefit it has received because it is aware that others including Computershare charge significantly less for a surety bond.

66. There is no justification for Defendant's retention of the excessive premiums and fees it has collected from Plaintiff and the members of the proposed Class. Defendant has retained these monies against the fundamental principles of justice, equity and good conscience.

67. If Plaintiff and the members of the proposed Class are, for some reason, unable to prevail against Defendant under Counts I or II of this Complaint, then the law provides this as a remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the members of the Class, respectfully requests that the Court enter judgment in their favor and against the Defendant as follows:

A. An Order that this action proceed pursuant to Rule 23 class; certifying the Class as requested herein; designating Plaintiff as Class Representative; and appointing Plaintiff's counsel as Class Counsel for the Class;

B. Ordering Defendant to render an accounting for all fees and charges collected directly and/or indirectly from the Class for the issuance of replacement certificates;

C. Ordering Defendant to pay actual damages to Plaintiffs and the other members of the Class;

D. Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and other members of the Class;

E. Ordering Defendant to pay both pre and post-judgment interest on any amounts awarded; and

F. Ordering such other and further relief as may be just and proper.

Respectfully submitted,

*s/ Dennis E. Murray, Jr.*
Dennis E. Murray, Jr. (0038509)
Nolan E. Murray (0097760)
Joseph A. Galea (0089550)
MURRAY & MURRAY CO., L.P.A.
111 East Shoreline Drive
Sandusky, Ohio 44870
Telephone: (419) 624-3126
Facsimile: (419) 624-0707
dmj@murrayandmurray.com
nem@murrayandmurray.com
jag@murrayandmurray.com

*Attorneys for Plaintiff*

**JURY DEMAND**

Plaintiff hereby demands trial by jury on all counts of this cause.

*s/ Dennis E. Murray, Jr.*
Dennis E. Murray, Jr. (0038509)
MURRAY & MURRAY CO., L.P.A.

*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing document was filed electronically on January 28, 2026. Notice of this filing will be sent to the parties listed below by operation of the Court's electronic system. Parties may access the filing through the Court's system.

*s/ Dennis E. Murray, Jr.*
Dennis E. Murray, Jr. (0038509)
MURRAY & MURRAY CO., L.P.A.

*Attorney for Plaintiff*